[No. F007745. Fifth Dist., Apr. 16, 1987.]

JULIE K. SMITH et al., Petitioners, v.
WORKERS' COMPENSATION APPEALS BOARD, MODESTO CITY
SCHOOLS et al., Respondents.

## COUNSEL

Green & Azevedo and Arthur V. Azevedo for Petitioners.

Mullen & Filippi, Michael H. Powers, Alex W. McKenzie, Richard W. Younkin, William B. Donohoe and Charles E. Finster for Respondents.

## OPINION

**BALLANTYNE, J.—**

### INTRODUCTION

Petitioner, Julie K. Smith (hereinafter Mrs. Smith), filed a worker's compensation claim arising out of injuries resulting in the death of her husband, Ronald Wayne Smith (hereinafter the decedent). Mrs. Smith filed the claim on her behalf and as guardian ad litem for her three minor children. The workers' compensation judge determined that the decedent's death did not arise out of and in the course of his employment. Mrs. Smith filed a petition for reconsideration. The Workers' Compensation Appeals Board denied the petition for reconsideration.

Mrs. Smith filed a petition for a writ of review in this court which was denied. She then filed in the Supreme Court a petition for review of this court's denial of her writ. The Supreme Court granted the petition and ordered the matter transferred to this court for hearing.

### STATEMENT OF FACTS

The decedent was employed by the Modesto City Schools as a math instructor and his status was temporary. In addition, he coached the girls' baseball and basketball teams for which he received additional pay.

Ila Westfall was the head of the math department and the advisor to the math club, which is an official school club. The club has many purposes,

including a place for students to get together, competitions, fund raisers, and scholarship awards. The club has two social functions: a Christmas party and an end-of-the-year get-together.

The end-of-the-year outing for the 1983-1984 school year was scheduled for June 7, 1984, at the Modesto Reservoir. An announcement of the meeting to plan the outing appeared in the school bulletin. The students invited each teacher in the math department to attend. (Ms. Westfall was required to attend because she was the club advisor.) Decedent was the only math instructor to accept the invitation. The decedent had attended the picnic the year before.

The students were required to fill out permission slips for the trip. The handbook required that the supervisor submit a field trip form to the administration for such excursions; however Ms. Westfall did not submit such a form and the principal stated that he does not survey the staff to see if they have complied with the procedures.

On the day of the picnic the decedent came home from school early to get things ready, and he purchased charcoal and lighter fluid with his own money. He, his wife Julie, and his three children got into their personal car and drove to the picnic where the decedent paid the fee to get into the reservoir from his own personal funds.

Decedent was the first to arrive. Some students arrived and then Ila Westfall arrived, bringing the food which had been purchased with math club funds. Ms. Westfall was accompanied by two other adults. She stated that if she had more than four students, she wanted extra adults along. The decedent started the fire and barbequed the food. Ms. Westfall brought along two student scholarship checks which had just come in at school that day and gave them to two students. The presentation of the checks was coincidental and not planned as part of the picnic.

One of the students brought along a windsurfer and the students used it both before and after they ate. The decedent watched the kids while they used the windsurfer, and then he tried the windsurfer. Decedent fell and was seriously injured, dying shortly thereafter.

The contract under which decedent was employed required that in addition to the regular hours spent working by a teacher "employees in grades 7-12 may be required to devote a reasonable amount of time to other duties assigned by the building administrator.

"As a guideline, the time spent by the employee on such additional duties should not exceed approximately 25 hours during a school year. The local

administrator may exceed this guideline only if his/her action is reviewed and approved by the Superintendent." These "adjunct" hours could be satisfied in several ways. At the beginning of the school year each teacher is asked how they want to satisfy their adjunct hours requirement. The teachers submit their preferences. A list is then published which identifies the specific duties for each staff member. Adjunct duties are not assigned to athletic coaches because they have such a heavy load. (This is true even though they receive extra pay for coaching.) Because decedent was a coach he was not assigned any adjunct duties. Ms. Westfall satisfied her adjunct hours by being the official math club advisor.

The teachers in Modesto City Schools are evaluated once a year. The evaluation form lists instructional and noninstructional duties as follows:

"2. INSTRUCTIONAL AND NONINSTRUCTIONAL DUTIES

"2.1 Teaches within the course of study for his/her subject area or at his grade level as prescribed in State law or adopted by the school district.

"2.2 Performs non-instructional tasks as required by State law and District policy.

"2.3 Attends school and District meetings related to his/her assignments.

"2.4 *Shares equally in the sponsorship or the supervision of out-of-classroom student activities.*" (Emphasis added.)

On decedent's evaluation for the 1982-1983 school year, one of the evaluator's comments under section 2.4 was "Mr. Smith gives freely of his time to supervise student activities. He has helped with the math superbowl, keeps time at our football games, etc. in addition to coaching two sports."[1] On his 1983-1984 academic year evaluation the following comment was made: "Mr. Smith devotes much effort to coaching and willingly accepts other assignments as requested. A fine, valuable staff member." These evaluations were signed by the decedent. The principal of Modesto High stated that teachers are encouraged to participate in extracurricular activities.

It was stipulated that if Mrs. Smith were called to testify she would state that she discussed adjunct duties with the decedent and in that conversation he was of the opinion that these adjunct duties were required of him in addition to his coaching duties. During the taking of her deposition Mrs. Smith testified as follows:

---

[1]Ms. Westfall requested him to attend the math superbowl.

"Q. . . . Now, Mrs. Smith, you've filed an application in which a claim is made that Mr. Smith's employment—basically that he was working at the time that he had the accident, and realizing you're not a lawyer and you don't have any legal opinion, I would like your personal opinion as to why you feel that he was working at the time.

"A. Well, basically I guess it's because we wouldn't have been out there if he didn't feel that he was asked to be out there because of his job. And he was a math person and so when she asked him to participate he felt it was his responsibility to do that, and whether or not the family had gone he still would have gone that day.

"Q. Now, do you know if he felt that he was required to go there that day?

"A. I don't think we ever discussed that. That wasn't his type of a personality to only do what he was required to do. If he felt that that was his responsibility, if that was something that he needed to do, then he would do it without really questioning, 'Are you telling me to go or are you asking me to go?' He wouldn't have questioned her, Ila's asking him to be there."

The decision of the workers' compensation judge provides in pertinent part: ". . . I will find that the Math Club picnic was sanctioned by the School, and can be considered an official school function. However, that fact does not determine the central issue in this matter.

"I have carefully searched this record for any evidence that Mr. Smith was officially assigned, or even officially requested, to attend the picnic. His invitation came from the Club members, and not the school administration. All other school math teachers were invited, but Mr. Smith was the only one of that group who attended the picnic.

"I have also considered the contention that Mr. Smith's attendance at the picnic could be considered as part of his 'adjunct duties.' It is my understanding that Mr. Smith attended the Math Club picnic in 1983. I an [sic] unable to determine from the evidence presented whether Mr. Smith counted his attendance at that picnic as part of his 'adjunct duties.' In any event, I am satisfied that the rule of the school requiring teachers to perform 25 hours of adjunct duty do not apply to athletic coaches employed by the school. Mr. Smith coached baseball and girl's basketball at the school, and he was not required to perform adjunct duties. These findings are based upon the testimony of Richard Lang, the School Principal.

"............................................................................

"Determination must be made whether Mr. Smith's attendance at the Math Club picnic was a reasonable expectation of his employment, or was expressly or impliedly required by that employment.

"I again have carefully considered all this evidence presented in this case, and have searched in vain for any evidence to create doubt as to whether applicant was a volunteer at the picnic, or whether his attendance at the picnic was a reasonable expectation, or was expressly or impliedly required by, of his employment.

"After my review, I have concluded that Mr. Smith was a volunteer, that his attendance at the picnic was not a reasonable expectation of his employment, and that attendance was neither expressly or impliedly required by his employment.

"I have also considered the contention that applicant's attendance at this picnic conferred a benefit to his employer. I have previously set forth my view that the Math Club was sanctioned by the School and this could be considered an official school function. That does not, however, mean that the Math Club picnic was a school picnic. The employer school was not required to conduct this picnic, had no part in its creation, did not furnish its equipment for use at the picnic, and had no part in the picnic activities. It was not, simply put, in any position where it needed any benefit from its employees to conduct the picnic.

"I am aware that all doubts are to be resolved in favor of an injured employee. I can find no doubt to resolve one way or another."

The Workers' Compensation Appeals Board opinion and order denying the petition for reconsideration provides in pertinent part: "Based on our review of the record we conclude that the WCJ's decision is justified for the reasons set forth in his Report and in his Opinion on Decision. We agree with the reasoning stated therein and we adopt that Report and that Opinion as part of our own opinion on decision.

"In addition to what the WCJ said we add that Mr. Lang [the principal] testified that the picnic was not a school sanctioned or school authorized event. Therefore there was no necessity for a faculty member to be present. Moreover, since the decedent was not asked to attend the picnic by the head of his department, and since he did not have adjunct duties, any subjective belief that he possibly might have had that his attendance was required would not have been an objectively reasonable one. (Labor Code § 3600(a)(8). *Ezzy* v. *WCAB* 146 CA3d 252 . . . .)"

## DISCUSSION

Mrs. Smith asserts that the trial judge's finding that decedent was a volunteer at the math club picnic was not supported by substantial evidence. She contends that pursuant to title 5, California Administrative Code, section 5531, the decedent was required to supervise students, and his attendance at school functions requires such supervision. Mrs. Smith asserts that the evidence showed that decedent considered his participation in math club activities as fulfilling his adjunct hour requirements. She argues that because decedent brought the charcoal and was to barbeque the food, it is "obvious" he felt his attendance was expected by the math club advisor, Ms. Westfall.

Mrs. Smith further asserts that decedent's attendance at the picnic was beneficial to the school because it carried out the policy of encouraging teacher-student contact outside of school settings. Again, relying on title 5, California Administrative Code, section 5531, she argues that decedent's presence was a direct benefit to the school because he fulfilled the supervision requirements.

Labor Code section 3600 provides in pertinent part: "(a) Liability for the compensation provided by this division, in lieu of any other liability whatsoever to any person except as otherwise specifically provided in Sections 3602, 3706, and 4558, shall, without regard to negligence, exist against an employer for any injury sustained by his or her employees arising out of and in the course of the employment and for the death of any employee if the injury proximately causes death, in those cases where the following conditions of compensation concur:

"..................................................................

"(8) Where the injury does not arise out of voluntary participation in any off-duty recreational, social, or athletic activity not constituting part of the employee's work-related duties, except where these activities are a reasonable expectancy of, or are expressly or impliedly required by, the employment. The administrative director shall promulgate reasonable rules and regulations requiring employers to post and keep posted in a conspicuous place or places a notice advising employees of the provisions of this subdivision. Failure of the employer to post such a notice shall not constitute an expression of intent to waive the provisions of this subdivision."

"Prior to the enactment of section 3600, subdivision (a)(8), section 3600 made no specific reference to athletic or recreational activities. [¶] Section 3600, subdivision (h), now section 3600, subdivision (a)(8), originated as

Assembly Bill No. 2555 (1977-1978). The bill analysis prepared by the Assembly Committee on Finance, Insurance, and Commerce when that committee heard Assembly Bill No. 2555 stated '[t]he thrust of [the proposed legislation] appears to overrule . . . *Goodman* v. *Fireman's Fund American Insurance Company* (1974) 74 OAK 49472, [which] found that a water skiing injury to an airline stewardess during a four-day layover in Tahiti was an employment-related injury' and therefore compensable. According to the bill analysis, the legislation was also intended to overrule *Lizama* v. *Workmen's Comp. Appeals Bd.* (1974) 40 Cal.App.3d 363 . . ., which held compensable an injury to a janitor, who, after receiving permission from his employer, used a company power saw after work hours. The committee report emphasized that the activities were held compensable because they were reasonably foreseeable or expectable in the work setting. [¶] Section 3600, subdivision (a)(8) was therefore intended to draw a brighter line delimiting compensability by replacing the general foreseeability test with one of 'reasonable expectancy' of employment." (*Ezzy* v. *Workers' Comp. Appeals Bd.* (1983) 146 Cal.App.3d 252, 260-261, fn. omitted [194 Cal.Rptr 90].)

"[I]t was the Legislature's intent to eliminate from the workers' compensation scheme *only* those injuries which were remotely work-connected. The use of such terms as 'reasonable expectancy' and 'impliedly required' in section 3600, subdivision (a)(8) is evidence that the Legislature recognized the potential use by employers of indirect means to encourage participation in an activity, and that such indirect encouragement changes the voluntary character of such participation. The Legislature intended that injuries occurring under such circumstances should be considered work-connected, and must fall within the coverage of the workers' compensation scheme." (*Id.* at p. 263.)

"In *Ezzy* v. *Worker' Comp. Appeals Bd.* (1983) 146 Cal.App.3d 252, . . . the court interpreted the 'reasonable expectancy' language. It noted that this test was a mere 'subset of the ultimate issue—whether the applicant's injury arose out of and in the course of her employment.' (*Id.* at p. 259.) Once a reasonable expectancy is found favoring the activity, the employee, though 'off duty,' is still in the course of employment and able to claim compensation. *Ezzy* decided that the 'reasonable expectancy' language required a dual inquiry: 'It is our view that the test of "reasonable expectancy of employment" in the context of the case at bar consists of two elements: (1) whether the employee subjectively believes his or her participation in an activity is expected by the employer, and (2) whether that belief is objectively reasonable.' (*Id.* at p. 260.)

"*Ezzy*, however, did not clearly interpret the 'expressly or impliedly required' language of subdivision (a)(8). That court did decide, however, that

by using such terms as 'reasonable expectancy' and 'impliedly required,' the Legislature meant to curtail indirect pressure by employers urging participation in 'off duty' activities. Such pressure, via this code section, would change the voluntary character of the participation, and allow a finding of course of employment if an injury occurred.

"The next case interpreting the language of section 3600, subdivision (a)(8), is *Meyer* v. *Workers' Comp. Appeals Bd.* (1984) 157 Cal.App.3d 1036 . . . . The *Meyer* court built upon *Ezzy*'s belief that the Legislature enacted section 3600, subdivision (a)(8), to prevent the indirect pressure by employers upon employees to participate in off-duty social and athletic activities. In so doing, *Meyer* interpreted the language in subdivision (a)(8) as being part of the same inquiry. As the court noted when commenting upon the Workers' Compensation Appeals Board decision, the board 'did not discuss whether participation was expressly or impliedly required by the employment. It should have considered the factors enunciated in *Ezzy* to determine the objective reasonableness of Meyer's expectancy.' (*Id.* at pp. 1042-1043.) Hence, *Meyer* interpreted the 'express or implied' language of section 3600, subdivision (a)(8), in conjunction with the second prong developed in the *Ezzy* test—the objective reasonableness of the employee's belief; evidence demonstrating and proving express or implied pressure upon the employee serves to establish the objective reasonableness of that employee's belief that he or she was required to participate in the off-duty activity.

"This interpretation of the code section, although perhaps inconsistent with its disjunctive form, is certainly consistent with the intent of the Legislature. The *Meyer* reading of the code section definitely effectuates the lawmakers' desire to remove indirect employer pressure upon employees regarding off-duty recreational activities by making injuries during such activities compensable in the event indirect coercion is found." (*Aetna Casualty & Surety Co.* v. *Workers' Comp. Appeals Bd.* (1986) 187 Cal.App.3d 922, 930-931 [232 Cal.Rptr 257].)

■ "Initially, the determination of an employee's subjective belief is a question of fact. Review of factual findings is limited to determining whether they are supported by substantial evidence. [Citations] Conversely, the question of whether an employee's expectancy is objectively reasonable is a question of law. A purported finding by the Board or its referee on a question of law is not binding on the appellate court." (*Meyer* v. *Workers' Comp. Appeals Bd.* (1984) 157 Cal.App.3d 1036, 1042 [204 Cal.Rptr. 74].)

■ Before deciding whether the court properly determined that decedent was a volunteer and that his presence conferred no benefit to the school, this court must first determine if decedent subjectively believed that his

participation was expected by his employer. Although this part of the test has been easily met in other cases by the employee testifying to his or her subjective belief, obviously such testimony is not available here. The only evidence which indicated decedent's subjective belief was the stipulation entered into by the parties "that if Mrs. Smith were called to testify, she would state she discussed 'adjunct' duties with the decedent and in that conversation decedent was of the opinion that these 'adjunct' duties were required of him in addition to his coaching duties." Additionally, as previously set forth, Mrs. Smith gave her personal opinion as to why decedent attended the picnic.

There was no evidence presented to contradict Mrs. Smith's statement regarding decedent's subjective belief. It must therefore be found that decedent subjectively believed his participation in the math club picnic was expected by his employer.

We must then determine if this belief was objectively reasonable. In our opinion, this requires a two-part analysis: (1) whether it was reasonable for decedent to believe that his participation in the math club picnic was part of his contractual adjunct hour requirement, and (2) whether it was reasonable for decedent to believe that his participation in the math club picnic was required by his employer in addition to his contractual adjunct hours as part of general adjunct duties.

The first part is easily determined. The principal of Modesto High testified that at the beginning of the year each teacher is asked how they want to satisfy their adjunct hours. The list is then published with each teacher's assigned duties identified. Because decedent was a coach he was not assigned any adjunct hours. Because of this published list delineating each teacher's assigned adjunct hour duties, it was clearly not objectively reasonable for decedent to believe that the math club picnic was used to satisfy his contractual 25 hour adjunct duty requirement.

Although not an express requirement of his employment contract, it is a close question whether it was an implied requirement of his employment.

In *Ezzy* v. *Workers' Comp. Appeals Bd., supra,* 146 Cal.App.3d 252: "Marilyn Ezzy (hereafter Ezzy) at all relevant times was employed by the law firm of Gassett, Perry & Frank (hereafter GPF) as a law clerk. On or about August 15, 1980, Ezzy participated in an employer-sponsored softball game, during which she injured the little finger on her right hand as she attempted to catch a fly ball.

"The record of the WCAB hearing discloses that GPF participated in a softball league composed primarily of civil defense law firms. The rules of

the league required that the teams be composed of both men and women, and required forfeiture if less than four women were present on each team.

"John Burton, (hereafter Burton) is a partner in GPF, and was the team coach. Burton stated that he did not have to recruit players; a sign up was conducted of all those who wanted to play. Burton testified that it was not a requirement that everyone will play. Some of the older and less athletically inclined members of the firm did not play. Some, but not all, of the secretaries participated. Everyone in the GPF firm, player and nonplayer alike, was provided at the firm's expense a special teeshirt emblazoned with his or her GPF billing number. Burton testified that GPF paid for the balls, bats and postgame refreshments. A postseason awards banquet was provided by GPF to which all employees were invited. Burton stated that no one was ever reprimanded or fired for not playing.

"Burton further testified that his secretary sent around memos reminding office personnel of games or practice. Burton stated that Administrative Director's Rule 9883, regarding off-duty recreational activities, was neither posted nor read to employees. Burton testified that 'the better players were more encouraged to be present than some of the ones that were not so good. That would also depend on how many men we had and how many women we had.' Burton stated that his team had never forfeited a game, and that he always had the correct number of female players there. He further testified that he did have one or two problems making sure one of their key women would be present at the games. Burton admitted that, although no business was derived from the games, they were very good for office spirit.

"Ezzy testified that she did not volunteer but was 'drafted' to join the team. On the first day after she returned from vacation, Burton approached Ezzy, handed her a teeshirt, a schedule of games and practices, and said, 'At the next one we'll see you there.' Ezzy understood there was a coed requirement, and when there appeared to be [a] shortage of women, the female members were urged to get out and play. Ezzy felt there was a spirit of camaraderie that the firm was trying to create, and that the strong urgings to play and the concern over having an adequate number of females led her to believe that she should play softball. Ezzy stated that the firm paid for postgame pizza and other refreshments. Ezzy testified that on one occasion home movies of a softball game were shown in the conference room of GPF offices during working hours, and that she and others were called in to watch. At the awards banquet, Burton received a whip as a gag-gift because he was such a 'hard driver.' " (*Id.* at pp. 257-258.)

In determining the objective reasonableness of Ezzy's belief, the court looked to the following factors to determine the purpose of the softball team:

"(1) whether the employer purchases the athletic uniforms or equipment; (2) whether such uniforms bear the employer's name or insignia; (3) whether wages are paid during practice or play; and (4) whether participation is voluntary." (*Id.* at p. 262.) The court found that Ezzy's participation in the softball game was a reasonable expectation of her employment. "Petitioner was a part-time law clerk in her second year of law school, a position which is low in the legal profession's hierarchy. As such, petitioner was more than usually vulnerable to pressure or suggestion that she join the law firm's softball team. Thus, when she was urged to play by one of the firm's partners, who was also the team coach, it was reasonable for petitioner to feel that she was expected to participate.

"There was relatively more pressure on female employees to participate because of the league's requirement that four women be present on the field at all times.

"A substantial benefit to the firm was generated by participation in the softball team by virtue of improved office cooperation, spirit, morale and camaraderie.

"The law firm paid for all equipment, for teeshirts for team members and other employees of the firm, as well as for post-game refreshments. The firm sponsored an awards banquet to which team members and other employees were invited." (*Id.* at p. 263.)

In *Meyer* v. *Workers' Comp. Appeals Bd., supra,* 157 Cal.App.3d 1036: "Meyer's supervisor, Bob Rhoden, invited several salesmen to join him for the weekend at his place near the Colorado River. The invitation was extended several days before to those salesmen who had the weekend off. Rhoden told them to bring wives or dates. Meyer testified he thought the gathering would be in the nature of a 'pep rally' because sales for the month of April had been down. His own sales for February and March, his first two months with the dealership, had been excellent. However, his sales had been slow during April.

"Meyer testified he decided to accept Rhoden's invitation because he wanted to get better acquainted with the sales crew, he needed a short vacation, and he was afraid he would be fired if he declined. He was not told, nor did he anticipate, any formal business discussions would take place.

"Elmore Motors provided all salesmen with company cars. The salesmen were free to drive the cars for their personal use as long as they remained within the country. After work on Friday, April 25, 1981, Meyer picked up his fiancee, drank a few beers, smoked a little marijuana, and began driving

to the river in his company car. At approximately 3 a.m. Meyer collided with a truck parked on the side of the road.

"The sole issue is whether the injuries suffered by Meyer in the collision arose out of and in the course of his employment." (*Id.* at pp. 1039-1040.)

The court found Meyer's injuries not compensable based upon the following analysis: "First, Meyer contends there was sufficient employer involvement because only employees of Elmore Motors, including their wives and dates, were invited. The mere congregation of employees with a supervisor for a social outing is far from the significant involvement by the employer law firm in *Ezzy*. The law firm was very supportive of its coed softball team. It purchased shirts for the players and other employees, paid for all equipment, distributed copies of scheduled games, and provided after game refreshments. Elmore Motors' only involvement was that one supervisor, who owned some type of accommodation on the river, invited employees to join him there for the weekend. There was no evidence Elmore Motors subsidized the outing. The invitation was extended informally a few days before the weekend. Unlike a softball league or other regularly sponsored activity, the river trip was an informal, 'last minute get together.'

"Secondly, by characterizing the weekend as 'a pep rally' instilling in the participating salesmen a 'spirit of camaraderie,' Meyer argues there is evidence of employer benefit. This factor is admittedly nebulous. Any time employees socialize, particularly with management personnel, there is arguably some potential for improved morale. However, an overbroad interpretation undermines the legislative intent to restrict compensability. The benefit to Elmore Motors from a few salesmen gathering with their wives and dates for a weekend at the river is, at best, speculative and remote. It is unreasonable to infer a legislative intent to expose employers to liability whenever a supervisor initiates a social activity with his or her colleagues.

"Finally, Meyer claims to have felt pressured to attend the gathering because of his poor sales, brief tenure, and fear of being fired. The question posed by subdivision (a)(8) is whether the employer either expressly or impliedly required participation. Meyer's sales performance for the month was not unique. He testified sales were off for everyone. He considered his performance, prior to the slump, to have been excellent. His supervisor merely commented that it would be good for him to get away for the weekend. Neither his situation nor the supervisor's conduct was comparable to the facts in *Ezzy*.

"Because Elmore Motors was minimally involved in the weekend outing, the potential benefit to it was marginal, and the pressure exerted was almost

nonexistent, Meyer's perception was objectively unreasonable. The river trip, although initiated by a supervisor, was not a reasonable expectancy of the employment." (*Id.* at pp. 1043-1044.)

In the instant case there are factors on both sides of the coin. On the one side, decedent was a temporary instructor at Modesto High. As such, he was more vulnerable to pressure or suggestion that he participate in extracurricular activities to better his chances of being rehired. The math club was an official school club. Notices of meetings to plan the picnic appeared in the school bulletin. The picnic was not an impromptu and informal gathering. Students were required to submit permission slips to the school. The food for the event was paid for out of the math club funds. The school was more than minimally involved in the picnic. Teachers were encouraged to involve themselves in extracurricular activities of the school, thus conferring the benefit of better teacher-student relationships. More importantly, teachers were evaluated on whether they shared equally in the sponsorship or the supervision of out of classroom student activities, and decedent had been commended for his participation in this area.[2]

On the other side, decedent used his personal funds to buy the charcoal and lighter fluid. Decedent drove his personal car, was accompanied by his family, and personally paid the entry fee to the reservoir. The picnic was purely a social event. Ms. Westfall failed to file a field trip request form and receive the principal's approval prior to the trip and therefore the picnic was not officialy sanctioned. Decedent was not the official club advisor and did not receive adjunct hour credit for his participation. Most importantly, decedent was invited by the math club students. There was no direct invitation by either Ms. Westfall or anyone in the school administration.

As previously discussed, decedent was evaluated on his participation in extracurricular activities. There was therefore some internal pressure to participate in these types of functions. Whether this indirect encouragement changed the voluntary character of decedent's participation in the picnic to an implied requirement of his employment is a question which we find extremely close. However, we are persuaded by Labor Code section 3202 to conclude that the employee should be compensated. Labor Code section 3202 provides that workers' compensation laws "shall be liberally construed

---

[2]Mrs. Smith asserts that pursuant to title 5, California Administrative Code, section 5531, decedent was required to attend the picnic. This section provides: "All athletic and social activities of pupils, wherever held, if conducted under the name or auspices of a public school or of any class or organization thereof, shall be under the direct supervision of certificated employees of a district or an office of a county superintendent of schools."

As advisor of the math club, Ms. Westfall was required to be at the picnic. There was no evidence presented to show that more than one instructor was required by law to attend the picnic or that decedent was requested to attend to satisfy the supervision requirement.

by the courts with the purpose of extending their benefits for the protection of persons injured in the course of their employment."

■ Respondent argues that if this court finds that decedent's attendance at the picnic was required by his employment, then his activities in using the windsurfer were outside the course and scope of his employment.

An injury is deemed to have arisen out of one's employment if there is an incidental or causal connection between the employment and the accident. (*Ross* v. *Workmen's Comp. Appeals Bd.* (1971) 21 Cal.App.3d 949, 956 [99 Cal.Rptr. 79].) Because attendance at the picnic was an implied requirement of decedent's employment, his accident which resulted from his engaging in the recreational activities which were part and parcel of the picnic's "entertainment" is causally connected to his employment. In hindsight, it may be that the decedent did not exercise the best of judgment, was negligent, or was at fault for engaging in a course of conduct that held the risk of resulting in injury. But, these factors do not bar compensation unless the employee's conduct is so remote to his occupational duties that there is no interrelation whatsoever between his employment and his injury. (*Ibid.*)

## DECISION

The decision of the Workers' Compensation Appeals Board is annulled and the cause is remanded to that board for proceedings consistent with the views expressed herein.

Woolpert, Acting P. J., and Vartabedian, J.,* concurred.

Petitions for a rehearing were denied May 14, 1987, and the petition of respondent Workers' Compensation Appeals Board for review by the Supreme Court was denied July 23, 1987.

---

*Assigned by the Chairperson of the Judicial Council.